UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SELIMA OPTIQUE, INC., on behalf of itself
and those similarly situated,

Plaintiff,

-against-

KERING S.A., KERING EYEWEAR,
KERING EYEWEAR USA, INC., ANTONIO
BORTUZZO, and KEN LIMING,

Defendants.

---

Civil Action No.

CLASS ACTION COMPLAINT FOR
VIOLATION OF THE LANHAM ACT
AND NEW YORK GENERAL BUSINESS
LAW §§ 349 AND 350; NEGLIGENT
MISREPRESENTATION, AND UNJUST
ENRICHMENT

JURY TRIAL DEMANDED

---

Plaintiff Selima Optique, Inc., brings this action on its own behalf, on behalf of a class of eyewear retailers, and on behalf of a class of eyewear manufacturers, against Defendants Kering S.A., Kering Eyewear, Kering Eyewear USA, Inc., Antonio Bortuzzi, and Ken Liming, who are manufacturers of eyewear, for false advertising, unfair competition, negligent representation, fraud, and unjust enrichment in violation of the Lanham Act and New York law. The following allegations are based upon information and belief, including the investigation of Plaintiff's counsel, unless stated otherwise.  Plaintiff requests a trial by jury of its claims.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1125(a); and supplemental jurisdiction over the entire case or controversy pursuant to 28 U.S.C. § 1267.

2.     This Court has personal jurisdiction over Defendants because Defendants engage in a continuous and systematic course of business in New York, or have substantial contacts

with, transact and solicit business in, or derive substantial monetary benefit from their contacts with the State of New York.

3.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants conduct business in or have substantial contacts with or may be found in the Southern District of New York and a substantial portion of the events at issue have arisen in this district, and because Defendants are subject to personal jurisdiction within this District.

## PARTIES

4.     Plaintiff Selima Optique, Inc. ("Selima") is an eyewear boutique founded by Selima Salaun ("Salaun"). Selima was incorporated in New York State in 1993.  Its first store opened in SoHo, New York City in 1993 and quickly became highly regarded in the fashion industry as a brand that embodies quality, craftsmanship, and creativity. Thereafter, Selima expanded and opened other stores in Manhattan, one in Santa Monica, California, and two in Paris, France. Selima is often commissioned by celebrities to produce custom eyewear frames, and is sought after by well-known fashion brands to design specialty collections.  Selima also carries other brand-name eyewear, such as YSL, Gucci, Brioni, Thomas Maier, Stella McCartney, among others. Selima purchases eyeglasses from Kering Eyewear wholesale, an arm of the fashion conglomerate Kering S.A.

5.     Kering S.A. is a French luxury goods holding company incorporated in France with its headquarters located at 40, rue de Sèvres, 75007 Paris, France.   Kering S.A. owns Alexander McQueen, Balenciaga, Brioni, Gucci, Puma, Volcom, YSL, and other luxury, sport and lifestyle brands distributed in 120 countries.  Kering S.A. was founded in 1963 by François Pinault and the company was previously named PPR.  PPR began as a timber trade business, and grew into its current conglomerate form due to a series of successful acquisitions.  In March

2013, PPR was renamed as Kering S.A..  François Pinault's son François-Henri Pinault is currently Kering S.A.'s Chairman and CEO.

6.　　Kering Eyewear was created in 2016 as a spin-off company of Kering S.A. solely to design and distribute eyewear products for the Kering S.A. luxury brands.

7.　　Kering Eyewear USA, Inc. ("Kering Eyewear USA") is a branch location for Kering Eyewear located at 200 Somerset Boulevard, Bridgewater, New Jersey 08807.

8.　　Antonio Bortuzzo ("Bortuzzo") is the CEO of Kering Eyewear USA.

9.　　Ken Liming ("Liming") is the Chief Operating Officer ("COO") of Kering Eyewear USA.

## INTRODUCTION

10.　　The "Made In Italy" label denotes sophisticated craftsmanship, luxury, and style. The products to which the label is attached relate to an exclusive Italian way of life. High-end Italian designers capitalize on this concept and utilize the "Made In Italy" label to justify premium prices.

11.　　The Italian luxury fashion business was once a niche business, serving only the wealthiest clientele with products made of the finest materials. However, in the 1980s, many brand names began producing logo-covered goods such as scarves, sunglasses, and other small accessories for the middle-income market, which moves products in greater volume. To maintain an air of luxury, marketing executives of the designer labels continued to play up the companies' exclusive artistry to justify the prices of the products, even though the items were made on assembly lines in developing countries such as China, to take advantage of the cheap labor using inexpensive materials. This allowed brands to minimize production costs and charge huge markups on their items.

12.     This practice was especially widespread in the designer eyewear industry. Eyeglasses and sunglasses cost very little to make, and are comparable between those that bear designer labels and those that end up in discount stores. In fact, sunglasses ordinarily cost approximately a few dollars to manufacture, unless they contain a more expensive material such as precious metals or authentic tortoiseshell.

13.     To protect the reputation of Italian luxury and craftsmanship, Italy passed a law in 2009 providing that only products entirely made in Italy (planning, manufacturing and packaging) are allowed to use the label "Made In Italy."[1] The Italian law is more restrictive than the laws in other countries such as Germany and the United States – Germany only requires "all essential manufacturing steps" to be in Germany; and the United States only requires that "all or virtually all" manufacturing to be in the United States. Italian law also forbids any conduct that would "lead a consumer to believe that the product or goods originate from Italy…without their being accompanied by specific, clear indications as to foreign provenance or origin…."[2]

14.     Some brands skirt labeling laws by producing a substantial part of their goods in China while saving the final "assembly" in Italy to earn the coveted "Made In Italy" label.

---

[1] Law 135, September 25th, 2009 – Chamber of Deputies, Parliament of Italy, Art. 16 states:

> Si intende realizzato interamente in Italia il prodotto o la merce, classificabile come made in Italy ai sensi della normativa vigente, e per il quale il disegno, la progettazione, la lavorazione ed il confezionamento sono compiuti esclusivamente sul territorio italiano.

Translated into English, the provision states:

> It is intended, to be made entirely in Italy, the product or goods classifiable as made in Italy under the current regulations, and for which the design, the production planning, the manufacturing, and the packaging are carried out solely on the Italian territory.

[2] Law 350, December 24th, 2003, Art. 4, paragraph 49.

Others act more egregiously and simply replace the "Made In China" labels with "Made In Italy" labels.

15.     Such is the case here.  Defendants deliberately and falsely represent that their eyeglasses and sunglasses are "Made in Italy," leading consumers to reasonably believe that Defendants' products are actually made in Italy. In truth, Defendants' products, or substantially all parts of their products, are made in China, and (at best) shipped to Italy for final assembly and packaging, and then exported.

16.     Wholesale customers and retail consumers, who pay a premium for Italian made products especially those carrying designer labels such as Yves Saint Laurent ("YSL"), are falling victim to a deceitful bait-and-switch scheme by Defendants, who are selling eyewear that are actually manufactured in China, while bearing the stamp "Made in Italy."

17.     Defendants' misleading packaging and labeling are exacerbated by an overall marketing campaign, online and in print, that mislead wholesale customers as well as  the consuming public to believe that their products are made in Italy. For example, in its press release announcing the launch of Kering Eyewear, Kering Group boasted its "high quality Italian manufacturing."[3] In an interview with the Wallpaper magazine[4], Roberto Vedovotto ("Vedovotto"), Chief Executive Officer ("CEO") of Kering Eyewear, spoke of its headquarters in Italy, about using niche manufacturers, and about "upping quality without ramping up prices." Vedovotto spoke of the expensive Japanese and Italian manufacturers and the high quality

---

[3] Press Release, Kering Plans To Take Back Control Of Its Eyewear Business Value Chain (Sept. 2, 2014), *available at* http://www.kering.com/en/press-releases/kering_plans_to_take_back_control_of_its_eyewear_business_value_chain_.

[4] Compton, Nick, *The frame game: an Italian startup is focused on transforming the fashion eyewear business*, Wallpaper (Sept. 2016), *available at* http://www.wallpaper.com/fashion/in-conversation-with-roberto-vedovotto-of-kering-eyewear-italian-upstart-that-means-business.

materials they use. Thomas Maier, a designer with a line of sunglasses part of Kering Eyewear's lineup, spoke to Esquire magazine about not using Japanese manufacturing because "Kering Eyewear is in Italy, with equally sophisticated manufacturing."

18.     On its brand webpage for the Brioni label, Kering states that "all their products [including eyewear] are made in Italy and meticulously handcrafted by expert artisans in the Abruzzo region."

19.     On its direct marketing website, YSL sells its sunglasses directly to retail customers and describes the sunglasses as "Made In Italy."

20.     Defendants are deceiving their wholesale clients, who are at risk of losing their good will and trust from retail customers, by selling them misrepresented products. The retail customers may associate the lower quality of the goods with the retailers, and may decide to stop purchasing products at the retailers.

21.     As a result of these unfair and deceptive practices, Defendants have likely collected millions of dollars from the sale of eyewear products that they would not have otherwise. Plaintiff and the Classes (defined below) therefore paid a premium for the eyewear products that were not what they purported to be, or have suffered by loss of profits and damage to their goodwill.

## SUBSTANTIVE ALLEGATIONS

**A.     Defendants and the Eyewear Market**

22.     Kering S.A. is a French luxury goods holding company and owner of Alexander McQueen, Balenciaga, Brioni, Gucci, Puma, Volcom, Saint Laurent Paris, and other luxury, sport and lifestyle brands distributed in 120 countries, including the United States.

23.     The global eyewear market, which includes frames, contact lenses, and

sunglasses, is significant and is expected to grow 19% to reach $136 billion by 2021. The demand for eyewear and the subsequent rising industry are attributed to increasing cases of myopia and ageing population, growing middle class and rising disposable incomes.

24.     The eyewear segment generated approximately 50 million euros in 2014 for Kering S.A., the year Kering Eyewear was created. In a press release announcing the launch of the spin-off Kering Eyewear, Kering S.A. highlighted that "[t]he premium segment of the eyewear business is currently growing in the high double-digits." For the first quarter of 2017, Kering Eyewear's total sales, before elimination of intra-group sales and royalties received by the brands, amounted 112.9 million euros. Net revenue for the period amounted to 85.5 million euros.

25.     Kering S.A. brands' eyewear collections were previously created through licensing agreements with external companies until 2016, when it announced that its eyewear collection would be produced in-house, after Kering S.A. terminated its licensing agreement with the external companies to bring the eyewear business back into Kering S.A. To that end, the company formed an internal venture called Kering Eyewear solely to design and distribute eyewear for the company's luxury brands.  Kering Eyewear is headed by Vedovotto, former CEO of Safilo, one of the external companies that had licensing agreements with Kering to produce the Company's eyewear. Kering Eyewear is independent from each fashion brand within the Company, but works closely with each fashion house to create eyewear to fit their branding and vision.

26.     Kering Eyewear was created to tighten control over all aspects of manufacture and production of its brands' eyewear products. Kering Eyewear is involved in every step of the business from design to marketing to sales, but continues to outsource manufacturing of the

products.

27.     Kering Eyewear is under much pressure to succeed in the eyewear market. Kering S.A.'s competitors have established avenues to manufacture its own eyewear products as well. For example, Kering's competitor LVMH announced a joint venture with Italian eyewear manufacturer Marcolin for the Céline and Louis Vuitton labels beginning in 2018. Earlier in the year, eyewear industry giant Luxottica merged with Essilor, Europe's leading lenses manufacturer, in a deal reportedly worth €4 billion, to create a company that is able to have businesses in both vision correction and sunglasses, wholesale and direct retail.

28.     Defendants sell most of their merchandise through wholesale shops such as Selima.

29.     Therefore, the economic interests of Defendants and eyewear boutiques are closely intertwined, as Defendants do not currently possess an effective direct sales avenue to reach consumers and must depend on stores such as Selima to create demand for its eyewear products by recommending and showcasing Defendants' products and completing the glasses with prescription lenses where needed. The product demand is also created by Defendants' labeling and advertising regarding where the products are made.

30.     Conversely, eyewear boutiques invest their money and shelf space stocking Defendants' products in their stores, along with time and reputations selling the products to their customers.

31.     Defendants are also one of Plaintiff's primary competitors in the luxury eyewear market, as they both manufacture and sell eyewear products at the same price point.

**B.     Plaintiff's Selima Optique**

32.     Plaintiff operates a chain of eyewear boutiques in New York, New York, Los

Angeles, California, and Paris, France.

33.     In addition to manufacturing eyewear under the Selima brand, Selima also makes wholesale purchases of other brand-name eyewear to sell to its retail customers.  Over the years, Selima has developed a strong customer base that was built on trust, personal connections, and reputation.

34.     On October 11, 2016, Salaun, along with Amine Lyoussi ("Lyoussi"), the Head of Operations/Merchandiser of Selima, placed an order in person for YSL, Gucci, Tomas Maier, Stella McCartney, Christopher Kane, and Brioni eyewear from a showroom of Kering Eyewear in midtown Manhattan, New York.

35.     A package containing YSL-branded eyeglass frame was delivered to Selima on February 9, 2017. Lyoussi opened the package and discovered that the frame was marked "Made In China" on one temple of the frame and "Made In Italy" on the other temple of the frame. Attached as "Exhibit A" are true and correct copies of photographs of the frame marked with the "Made In China" stamp on one temple and "Made In Italy" stamp on the other temple.

36.     Salaun sent a letter via mail and email to Kering concerning the issue of the "Made In China" and "Made In Italy" stamps, and received a response over email from Kyle Lepack ("Lepack"), Regional Manager at Kering Eyewear, who after speaking to Defendant Liming (Kering Eyewear USA's COO), attempted to explain the situation by citing a manufacturing mistake, and that the "Made In China" temple belonged to a pair of glasses in the Puma line that is made in China.  Lepack did not explain why a temple that is stamped "Made In China" belonging to a pair of sunglasses that is purported to be made in China would inexplicably end up in an Italian factory.

37.     Defendant Bortuzzo followed up the exchange between Lepack and Salaun with a

phone call and an email, reiterating that the Made In China stamp on the temple was purportedly a mere manufacturing mistake.

38.     Plaintiff intends to make additional purchases of Kering Eyewear products. However, Plaintiff has no way to determine prior to its purchases whether the products sold by Defendants are genuinely made in Italy. Thus, in the absence of the injunctive relief requested in this Complaint, Plaintiff is likely to be deceived in the future and to suffer additional harm.

**The Eyewear Manufacturing Process And The Bait-And-Switch Scheme**

39.     A pair of eyeglasses is made up of a number of components, which could include:

- Frame front: the front portion of the glasses into which lenses are inserted

- Bridge: the area that arches up over the nose between the lenses. It is designed to support the majority of the glasses' weight

- End Piece: the portion of the frame that extends outward from the lenses and connects to the temples

- Hinge: the portion of the frame that connects the rim to the temple and allows the temple to fold inward

- Temple: also called the arm, this is the piece of the frame that extends over the ear to help hold the glasses in place

40.     Eyewear companies often outsource the manufacturing and production of eyeglass parts to China, then ship the parts to Italy for final assembly. Those parts bear the "Made In China" stamp, as they should.  However, companies often erase the "Made In China" stamps on the fronts and temples then replace them with "Made In Italy" stamps. This deceitful manufacturing practice benefits the companies, allows them to cut costs by using cheap Chinese labor and materials while retaining the allure of Italian manufacturing.

**Defendants' Deceptive Labeling**

41.     On their product labels, on the internet, and in print, the Defendants advertise

their products as "Made In Italy."

42.     For example, on the YSL direct marketing e-commerce website, http://www.ysl.com/us, Defendants describe the YSL sunglasses as "Made In Italy."

43.     By stating that the products are "Made In Italy," Defendants lead consumers to believe that the products are in fact made in Italy even though the eyewear products are made in China, as evidenced by the "Made In China" stamp on a temple of one of the eyeglasses that Defendants attempted to erase. At best, the eyeglasses are made up of components that are made in China and shipped to Italy for final assembly and packaging. This final step in manufacturing does not transform a product that was made in China so much so for the product to be considered to be originated from Italy.

44.     Part 134, Chapter 1 of Title 19 of the Code of Federal Regulations sets forth regulations implementing the country of origin marking requirements and exceptions of section 304 of the Tariff Act of 1930, as amended (19 U.S.C. § 1304), together with certain marking provisions of the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202).

45.     19 C.F.R. § 134.46 requires that:

> In any case in which…the name of any foreign country or locality other than the country or locality in which the article was manufactured or produced appear on an imported article or its container, and those words, letters or names may mislead or deceive the ultimate purchaser as to the actual country of origin of the article, there shall appear legibly and permanently in close proximity to such words, letters or name, and in at least a comparable size, the name of the country of origin preceded by "Made in," "Product of," or other words of similar meaning.

46.     All of Defendants' products are marketed with labels in bold font that states "Made In Italy," when the products are, in fact, the product of countries other than Italy, i.e., China. Yet, Defendants, in violation of 19 C.F.R. § 134.46, do not include on the products, "in

close proximity" to the "Made In Italy" representation, any indication of the true country of origin of the eyeglasses preceded by "Made in," "Product of," or other words of similar meaning. Instead, Defendants state only on the temples of the eyeglasses, that the eyeglasses are "Made In Italy", falsely suggesting to wholesale purchasers and consumers that the eyeglasses in their entirety are made in Italy.

47.     Though Defendants may contend that their products are assembled in Italy, U.S. Customs and Border Protection ("CBP"), Department of Homeland Security has ruled that the ultimate purchaser is entitled to all relevant product information including the country of origin information. *See* HQ 557996, dated October 8, 1997, *referencing* HQ 730963. Specifically, the CBP has also ruled that mere assembly of frame components is not substantial transformation for the product to be considered "made in" the country where the product was assembled. *See* HQ 709266 (July 11, 1978); *see also* HQ 728504 (October 15, 1985) (the mere assembly of imported frames did not constitute a substantial transformation and the country of origin marking was required on the imported fronts and temples). Finally, the CBP has ruled that "[e]yeglass frames imported into the United States are required to be marked with the words 'Frame (Country of Origin)' or 'Frame Made in (Country of Origin)' on the temple of the frame." NY J88806 (October 3, 2003).

48.     The country of origin claims Defendants make on the eyeglasses mislead consumers, as they have misled Plaintiff, by prominently labeling their products "Made In Italy" without any qualifiers or disclaimers.

**Defendants' False Advertising and Unfair Competition**

49.     Defendants' labeling, advertising, and marketing of their products misrepresent the origin of the Defendants' products.  Despite stamping the products "Made In Italy,"

Defendants' products are actually made in China.

50.     Defendants' false and misleading advertising of its eyewear products is damaging to the reputation and goodwill of Plaintiff and is damaging to the consuming public. The false and misleading representations are designed to entice consumers to purchase Defendants' products over Plaintiff's products. Specifically, Defendants' false and misleading representations regarding the country of origin of their products imply that their eyewear products are made in Italy and of a higher quality such as Plaintiff's eyewear products, when in fact Defendants are selling cheaply made eyewear products made with inferior materials that were produced in China.

51.     Defendants are, therefore, tricking consumers into thinking that they are purchasing equally high quality goods as Plaintiff's, when in fact the consumers are receiving inferior products.

52.     Defendants' wrongful conduct has resulted in increased sales of Defendants' eyewear products while hindering the sales of Plaintiff's products and damaging Plaintiff's goodwill. Plaintiff has sustained and will sustain damages as a result of Defendants' wrongful conduct.

53.     By falsely labeling, advertising, marketing, promoting their products as "Made in Italy," Defendants use the Plaintiff's services, goodwill, and reputation, and create a false impression as to the quality and origin of Defendants' products and the Plaintiff's business and services. These misrepresentations result in lost revenue, lost profits, lower business value, and lost goodwill and reputation to the Plaintiff.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action against Defendants on behalf of itself and all others

similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23. Plaintiff

seeks to represent the following classes of similarly situated persons and entities:

WHOLESALE PURCHASERS CLASS:

All wholesalers of eyeglasses and sunglasses that purchased Kering Eyewear products, for resale to retail customers, within the United States at any time from September 2016 to the present "the "Class Period").

COMPETITOR CLASS:

All manufacturers of eyeglasses and sunglasses within the United States at any time during the Class Period.

55.     Plaintiff, in the manner described in Third through Sixth Causes of Action pled

below, also asserts claims on behalf of itself and of the New York Wholesale Purchasers

Subclass and the New York Competitor Subclass, for Defendants' violation of the Lanham Act

and the New York General Business Law §§ 349 and 350, and New York common law. The

New York Wholesale Purchasers Subclass consists of all members of the Wholesaler Purchasers

Class in New York State that purchased Kering Eyewear products, for resale to their retail

customers, at any time during the Class Period. The New York Competitor Subclass consists of

all members of the Competitor Class within New York State at any time during the Class Period.

56.     The Wholesale Purchasers Class, the Competitor Class, the New York Wholesale

Purchasers Subclass, and the New York Competitor Subclass will sometimes be collectively

referred herein as the Classes.

57.     The Classes are sufficiently numerous or geographically dispersed throughout the

United States that joinder of all members of the Classes is impracticable.

58.     Plaintiff's claims are typical of the members of the Classes.

59.     This action involves common questions of law and fact to the Classes because

each Class member's claim derives from the deceptive, unlawful, or unfair representations and omissions that led Defendants' customers to believe that the products were made in Italy. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. Among the common questions of law and fact are:

        a)      whether Defendants' products were made in Italy;

        b)      whether Defendants unfairly, unlawfully and/or deceptively failed to inform members of the Wholesale Purchasers Class and the New York Wholesale Purchasers Subclass that their products were not "Made In Italy" while stating so on the products;

        c)      whether Defendants misled the Wholesale Purchasers Class and the New York Wholesale Purchasers Subclass by, *inter alia*, representing that their products were "Made In Italy";

        d)      whether Defendants' advertising and marketing regarding their products sold to the Wholesale Purchasers Class and the New York Wholesale Purchasers Subclass members were likely to deceive the Wholesale Purchasers Class and the New York Wholesale Purchasers Subclass members or was unfair;

        e)      whether Plaintiff has standing to sue under the Lanham Act;

        f)      whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

        g)      the amount of revenues and profits Defendants received or the amount of monies or other obligations lost by members of all Classes as a result of such wrongdoing;

        h)      whether members of the Classes are entitled to injunctive and other equitable relief and, if so, what relief is injunctive or equitable relief appropriate;

i)      whether members of the Classes are entitled to payment of actual, incidental, consequential, exemplary, or statutory damages plus interest thereon, and if so, what measure of damages is appropriate;

j)      whether Plaintiff and the members of the Classes are entitled to recover up to three times their lost profits or Defendants' profits; and

k)      whether Plaintiff is entitled to recovery of attorneys' fees and expenses and, if so, the measure of attorneys' fees and expenses that Plaintiff should recover.

60.      Plaintiff's claims are typical of the members of all Classes because it purchased Defendants' eyewear products in reliance on Defendants' misrepresentations and omissions that they were "Made In Italy." Plaintiff is also a manufacturer of eyeglasses and sunglasses. Thus, Plaintiff and the members of the Classes sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

61.      Plaintiff will fairly and adequately protect the interests of all members of the Classes because it is in its best interests to prosecute the claims alleged herein to obtain full compensation due to it for the unfair and illegal conduct of which it complains. Plaintiff also has no interests that are in conflict with or antagonistic to the interests of the members of the Classes. Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and that of the classes. By prevailing on its own claim, Plaintiff will establish Defendants' liability to all members of the Classes. Plaintiff and its counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the members of the Classes and are determined to diligently discharge those duties by vigorously seeking the maximum possible

recovery for class members.

62.     There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

63.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

### Violation of the Lanham Act – False Advertising (15 U.S.C. § 1125(a))

64.     Plaintiff repeats and realleges paragraphs 1 through 63 above as though they were fully set forth herein. Plaintiff does not plead, and hereby disclaims, causes of action under the Tariff Act, which Plaintiff relies on only to the extent such law provides a predicate basis of liability under the Lanham Act.

65.     Plaintiff has a reasonable interest that should be protected against Defendants' false and misleading advertisements and a reasonable basis for believing their interests have been and are being damaged by Defendants' false and misleading advertising.

66.     Defendants made false and misleading statements in commercial advertising concerning Defendants' eyewear products.

67.     The false and misleading statements concern the nature, characteristics, qualities, or origin of the Defendants' products.

68.     Defendants' statements are literally false, or the statements are misleading and likely to confuse or deceive purchasers of the Defendants' products.

69.     The falsity and deception was material and was likely to influence purchasing decisions.

70.     Defendants' goods traveled in interstate commerce.

71.     Plaintiff was injured by lost profits, loss of goodwill, and other injuries.

72.     Plaintiff's injuries were caused, in whole or in substantial part, by Defendants' acts of false advertising and unfair competition described herein.

73.     Defendants' acts constitute a violation of the Lanham Act and entitle Plaintiff to recover Defendants' profits, Plaintiff's damages, and the costs of this action. The circumstances of this case and the Defendants' actions entitle Plaintiff to recover Defendants' profits, three times the damages to the Classes, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### Violation of the Lanham Act – Unfair Competition (15 U.S.C. § 1125(a))

74.     Plaintiff repeats and realleges paragraphs 1 through 63 and paragraph 64 above as though they were fully set forth herein.

75.     In connection with their "Made In Italy" products, Defendants made false and misleading descriptions of fact.

76.     The Defendants' false and misleading descriptions of fact are likely to cause confusion, or to cause mistake, or to deceive consumers as to the affiliation, connection, and

association of Defendants' products.

77.     The Defendants' false and misleading descriptions of fact are likely to cause confusion, or to cause mistake, as to the Plaintiff's sponsorship and approval of Defendants' "Made In Italy" products.

78.     The falsity and deception was material.

79.     Defendants' goods traveled in interstate commerce.

80.     Plaintiff was injured by declining sales, lost profits, loss of goodwill, and other injuries.

81.     Plaintiff's injuries were caused, in whole or in substantial part, by Defendants' acts of false advertising and unfair competition described herein.

82.     Defendants' acts constitute a violation of the Lanham Act and entitle Plaintiff to recover Defendants' profits, Plaintiff's damages, and the costs of this action. The circumstances of this case and the Defendants' actions entitle Plaintiff to recover Defendants' profits, three times the damages to the Classes, and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### Fraudulent & Deceptive Trade Practices Under N.Y. General Business Law § 349

83.     Plaintiff repeats and realleges paragraphs 1 through 63 above as though they were fully set forth herein.

84.     Defendants conduct business, trade, or commerce in the selling their goods in the State of New York under N.Y. Gen. Bus. Law § 349.

85.     Defendants, through their intentional mislabeling of products as Made In Italy, among other things, committed unfair, or deceptive acts or practice which are actionable under N.Y. Gen Bus. Law § 349.

86.     The above-described misconduct of Defendants is without any legal justification and constitutes a knowing and willful violation of applicable law, including N.Y. Gen Bus. Law § 349.

87.     The above-described misconduct of Defendants caused Plaintiff undue damage and expense, including, but not limited to, the following direct, indirect, and consequential damages: lost out-of-pocket expenses; lost business opportunities; lost profits; lost value of goodwill, the going concern, or capital asset; value of its business, lost business reputation; loss of time and money; and payment of court costs and attorneys' fees.

88.     The misconduct of Defendants must be preliminarily and permanently enjoined, and Plaintiff should be awarded the maximum statutory award for damages, including, but not limited to, actual damages, treble damages, and reasonable attorneys fees pursuant to N.Y. Gen Bus. Law § 349(h).

## FOURTH CAUSE OF ACTION

### False Advertising Under N.Y. General Business Law § 350

89.     Plaintiff repeats and realleges paragraphs 1 through 63 above as though they were fully set forth herein.

90.     Plaintiff brings this claim on behalf of itself and the New York Subclasses pursuant to the New York General Business Law § 350.

91.     New York General Business Law § 350 makes "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York unlawful.

92.     Under New York General Business Law § 350, the term "false advertising" means, in relevant part, "advertising, including labeling, of a commodity … if such advertising is misleading in a material aspect." N.Y. Gen. Bus. Law § 350-a(1).

93.     As fully alleged above, by advertising, marketing, distributing, or selling their eyewear products with claims that they are "Made In Italy," and using the other representations identified above, to Plaintiff and the New York Subclasses, Defendants violated New York General Business Law § 350 by engaging in, and it continues to violate New York General Business Law § 350 by continuing to engage in, false advertising concerning the country of origin of Defendants' eyewear products, which are, in fact, not Italy, as alleged above.

94.     Plaintiff and the New York Subclasses seek to enjoin such unlawful acts and practices as described above. Each of the New York Subclasses members will be irreparably harmed unless the Court enjoins Defendants' unlawful actions, in that Plaintiff and the New York Subclasses will continue to be unable to rely on Defendants' representations regarding the geographic origin of Defendants' eyewear products.

95.     Plaintiff and the New York Subclasses were injured in fact and lost money as a result of Defendants' conduct of improperly marketing Kering eyewear products as being made in Italy. Plaintiff and the New York Subclasses paid for products that were of Italian origin, but did not receive such products.

96.     The products Plaintiff and the New York Subclasses received were worth less than the products for which they paid. Plaintiff and the New York Subclasses paid a premium price on account of Defendants' misrepresentations that their products are of Italian origin.

97.     Plaintiff and the New York Subclasses seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues or profits, injunctive relief, enjoining Defendants from continuing to disseminate its false and misleading statements, and all other relief allowable under New York General Business Law § 350.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

98.     Plaintiff repeats and realleges paragraphs 1 through 63 above as though they were fully set forth herein.

99.     Defendants have represented to the public, including Plaintiff, by promoting, marketing, advertising,  packaging, labeling, and other means, that their eyewear products have characteristic and qualities that they do not have – specifically, that they are made in Italy.

100.     Defendant made the false representations herein alleged with the intention of inducing Plaintiff and the consuming public to purchase their eyewear products.

101.     Defendants possess specialized and unique knowledge regarding the true nature and origin of the eyewear products and therefore in a special position of confidence and trust with the Plaintiff. Plaintiff promote Defendants' products and maintains a close relationship with Defendants.

102.     Plaintiff and the New York Subclasses believed and relied upon Defendants' promoting, marketing, advertising, packaging, and labeling of the eyewear products and, in justifiable reliance thereon, purchased them.

103.     At the time Defendants made the misrepresentations herein alleged, Defendants had no reasonable grounds for believing the representations to be true, as evidenced by their removal of the "Made In China" stamp on one of the products.

104.     As a proximate result of Defendants' negligent misrepresentations, Plaintiff and the New York Subclasses were induced to spend an amount to be determined by the Court or jury on Kering eyewear products manufactured, distributed, and sold by Defendants, and Plaintiff and the New York Subclasses lost money by purchasing the eyewear products which were not what they were represented to be, were worth less than Plaintiff and the New York

Subclasses paid for the eyewear products, and that Plaintiff and the New York Subclasses would not have purchased but for the misrepresentations.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

105.    Plaintiff repeats and realleges paragraphs 1 through 63 above as though they were fully set forth herein.

106.    Defendants received from Plaintiff and the New York Subclasses benefit in the form of inflated profits related to Defendants' misrepresentations of the eyewear products as made in Italy, when they are in fact made in China.

107.    Defendants implemented procedures to mislead consumers into believing that Kering eyewear products were made in Italy when they were made in China.

108.    Defendants collected money from Plaintiff and the New York Subclasses in excess of what Plaintiff and the New York Subclasses would have paid for eyewear products that were made in China.

109.    The money directly benefited Defendants and was taken to the detriment of Plaintiff and the New York Subclasses. Plaintiff and the New York Subclasses believed they were paying for high quality Italian products, when in reality Defendants were cutting costs for a higher profit margin. Therefore, Defendants had the incentive to charge and collect unreasonably inflated prices for the eyewear products.

110.    As a result, Plaintiff and the New York Subclasses have conferred a benefit on Defendants.

111.    Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

112.    Defendants will be unjustly enriched if allowed to retain the aforementioned benefits, and each New York Subclass member is entitled to recover the amount by which the Defendants were unjustly enriched at their expense.

## RELIEF REQUESTED

WHEREFORE, Plaintiff hereby demands judgment against Defendants, jointly, severally, or individually, as follows:

A.    That the Court determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23 and direct that reasonable notice of this action, as provided by Rule 23 of the Federal Rules of Civil Procedure, be given to all members of the Classes;

B.    That the Court determine the false and misleading statements and pattern of deceptive practices alleged herein to be in violation of the Lanham Act and New York law;

C.    That Plaintiff and the Classes recover their damages, the disgorgement of Defendants' profits, and up to three times their damages, as provided by law, and that judgments in favor of Plaintiff and the Classes be entered against Defendants;

D.    That Plaintiff and the Classes recover their costs of this action, including reasonable attorneys' fees, as provided by law; and

E.    That Plaintiff and the Classes be granted such other, further and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 13, 2017

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By:      __s/ Mark C. Rifkin__
Mark C. Rifkin
rifkin@whafh.com
Benjamin Y. Kaufman
kaufman@whafh.com
Gloria K. Melwani
melwani@whafh.com
270 Madison Ave.
10th Floor
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114

Kerry Gotlib, Esquire
gotlaw@aol.com
80 5th Avenue
New York, New York 10011
(212) 924-1609

*Attorneys for Plaintiff*

25